UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:                                                           Chapter 11
                                                                 Case Nos. 10-16877 (SHL)
**DUNKIN 36 LLC, et al.,**                                       10-16878 (SHL)
                                                                 10-16879 (SHL)
                        Debtors.                                 Jointly Administered

--------------------------------------------------------X

## SECOND AMENDED JOINT DISCLOSURE STATEMENT PURSUANT TO §1125 OF THE BANKRUPTCY CODE

### I.
### PRELIMINARY STATEMENT

Dunkin 36 LLC, Dunkin 36 I LLC and Dunkin 36 II LLC (collectively, the "Debtors") and Dunkin Lender LLC (the "Sponsor") are the proponents of the Amended Plan of Reorganization dated April 1, 2011 (the "Plan"), and submit this second amended disclosure statement dated April 1, 2011 ("Disclosure Statement") pursuant to §1125 of Title 11 of the United States Code (the "Bankruptcy Code") to all holders of Claims (the "Claimants") against or Interests in the Debtors in order to inform Creditors of the provisions of the Plan so they can determine if they wish to object to the Plan.

Accompanying this Disclosure Statement are copies of the following documents:

(a)      The Plan of the Debtors,

(b)      The Plan Support and Acceptance Agreement between the Debtors, the Sponsor, the First Mortgagee and the Subordinate Secured Lender that provides for the Debtors' transfer of all the Debtors assets (the "Assets") including the Real Property consisting of land and buildings owned by the Debtors and located at 3600 Broadway, 3750 Broadway and 4060 Broadway, New York, New York, the rental income from and after the Sale Closing Date, the Debtors' inventory, furniture, fixtures and equipment, and interests in the Assumed Executory

1

Contracts, the Required Security Deposits and the Debtors' goodwill. All other executory contracts between the Debtors and third parties shall be rejected by the Debtors.

(c) The notice fixing the date, time and place of a hearing to consider confirmation of the Plan and related matters, including objections to the Plan,

The Court has scheduled a joint hearing to consider approval of this disclosure statement and confirmation of the Plan on April 4, 2011 at 11:00 a.m. of such day, in Room 701, United States Bankruptcy Court, One Bowling Green, New York, New York 10004-1408. Except where expressly defined herein, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan or in the Bankruptcy Code, as applicable.

**The Debtors have already received Ballots accepting the Plan, substantially in conformity with Official Bankruptcy Form No. 30, from all holders of Claims or Interests, whose Claims or Interests are impaired by the Plan. Under the Bankruptcy Code, only classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired if the holder's legal, equitable or contractual rights are changed under a plan. A plan is accepted by an impaired class of claims if the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims of that class which vote, vote to accept the plan. A plan is accepted by an impaired class of interests if the holders of at least two-thirds (2/3) in number of the allowed interests of such class which vote, vote to accept the plan. Under the Plan, in accordance with the Plan Support and Acceptance Agreement, all Classes of Claims and Interests that are impaired within the meaning of §1124 of the Bankruptcy Code have accepted the Plan. All other Classes of Claims are to receive payment in full for their claims (without interest, except for Class 1 Claims due the City of New York which shall be paid interest). Accordingly, the Plan**

**shall be conclusively deemed to have been accepted pursuant to §1126(f) of the Bankruptcy Code as HOLDERS OF CLASS 2 and CLASS 3 CLAIMS HAVE VOTED IN FAVOR OF THE PLAN. All the other Classes of Claims are being paid in full and are not impaired under the Plan and Class 8 Interests have accepted the Plan pursuant to the Plan Support and Acceptance Agreement.**

This Disclosure Statement is being submitted for approval by the Honorable Sean H. Lane, United States Bankruptcy Judge in accordance with §105(d)(2)(B)(vi) of the Bankruptcy Code, which permits the Court to hold a joint hearing on the Disclosure Statement and the Plan. The Debtors and the Sponsor believe that the Court will find that the Disclosure Statement contains "adequate information," as that term is defined in §1125 of the Bankruptcy Code, to permit creditors and interested parties to make an informed judgment whether or not to object to the Plan. The United States Trustee has not appointed a creditors committee in any of the Cases. No other representations concerning the Debtors, their operations, the value of their properties, the Claims against the Debtors or Interests in the Debtors have been authorized, and none should be relied upon in arriving at your decision to object to the Plan.

The Plan, Disclosure Statement, the cash collateral order and various other first day orders were filed by the Debtors on the Filing Date. Only the First Mortgagee and the Subordinate Secured Lender (collectively, the "Secured Creditors") are impaired under the Plan. The Claims of all the other Classes of Creditors are being paid in full. The Debtors believe that without the Sponsor's agreement to advance the payment to Class 1, 3, 4, 5, 6 and 7 Claims, there would be no funds available to pay to said Classes of Claims. The independent Real Estate Counsel retained by the Sponsor and by the Holders of Membership Interests have obtained and reviewed title reports, effective November 17, 2010, for the Real Property which indicate that the interests of the Secured

Creditors have been validly perfected. The amount due the First Mortgagee is in excess of $16.1 million and the amount due the Subordinate Secured Lender is $450,000 plus accrued interest. Under the Plan Support and Acceptance Agreement the Debtors are to transfer the Real Property to the Sponsor, with the First Mortgage to remain in place. The Subordinate Secured Lender has agreed to waive all interest due and accept payment of $450,000 in full settlement of its claim. Recent appraisals of the Real Property indicate that their aggregate value approximates $10.1 million, which is less than the amount due to the First Mortgagee. The Debtors believe that the Plan is the most efficient and expeditious means to transfer the Debtors' Assets, resolve Claims and realize a recovery for all Creditors. **CLAIMANTS AND INTEREST HOLDERS ARE URGED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN FULL. THE PLAN REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BETWEEN THE DEBTORS, THEIR CREDITORS AND INTEREST HOLDERS, AND SHOULD BE READ TOGETHER WITH THIS DISCLOSURE STATEMENT IN ORDER THAT AN INFORMED AND INTELLIGENT JUDGMENT CONCERNING THE PLAN CAN BE MADE. TO THE EXTENT THERE IS ANY INCONSISTENCY BETWEEN THE PLAN, THIS DISCLOSURE STATEMENT, AND THE DHPD STIPULATION, THE TERMS OF THE DHPD STIPULATION SHALL CONTROL.**

**EXCEPT AS OTHERWISE INDICATED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE**

STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF INFORMING CREDITORS OF THE PROVISIONS OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW THE PLAN AFFECTS CREDITORS AND INTEREST HOLDERS.

## II.

## DESCRIPTION AND HISTORY OF THE DEBTORS' OPERATIONS

1.      All of the Debtors are New York State limited liability companies. All of the Debtors' residential units consist of a variety of rent stabilized, rent controlled and free market residences. Duncan 36 LLC ("Dunkin") acquired its real property, 4060 Broadway, New York City, Block 2141, Lot 13 ("4060") on October 11, 2005 from Vaso Realty Corp. for sum of $7,150,000. An appraisal performed on December 10, 2010 (the "Appraisal") indicates that the current value of its real property is $4.2 million. 4060 has no elevator, has a live-in super and contains 45 units of which 3 are presently vacant. Duncan 36 I LLC ("Dunkin I") acquired its real property, 3750 Broadway, New York City, Block 2114, Lot 5 ("3750") on October 11, 2005 from 3750 Broadway LLC for sum of $7,350,000. The Appraisal indicates that the current value of its real property is $3.8 million. 3750 is an elevated building, has a live-in super and contains

46 units of which 2 are vacant. Duncan 36 II LLC ("Dunkin II") acquired its real property, 3600 Broadway, New York City, Block 2080, Lot 1 ("3600") on September 21, 2005 from Prana BF Partners for sum of $4,125,000. The Appraisal indicates that the current value of its real property is $2.1 million. 3600 has no elevator, does not have a live-in super and contains 23 units of which 1 is vacant.  Hereinafter 4060, 3750 and 3600 shall be collectively referred to as the Real Property.

2.     The sole members of Dunkin 36 and Dunkin  II are Behrooz Hedvat and Faramarz Hedvat, each of whom holds 50% memberships in those entities.  The members of Dunkin I are Behrooz Hedvat and Faramarz Hedvat each of whom own 37.5% membership interests and Payam Farahn who owns a 25% membership interest in that Debtor.  Each of the Debtors file separate and distinct tax returns.

3.     The Real Property was acquired through a consolidated mortgage loan in the amount of $12,750,000 from Intervest National Bank ("Intervest").  On July 26, 2007 the Debtors obtained a subordinated loan from Intervest in the amount of $1,928,356.  Intervest assigned both mortgages to VFC Partners 4 LLC on May 21, 2010 and VFC Partners 4 LLC assigned said mortgages to the Sponsor on September 24, 2010.  On or about November 18, 2010, Sponsor assigned said mortgages to HWH Uptown LLC (the "First Mortgagee") as part of the Repurchase Agreement, which grants the Sponsor the right to repurchase the First Mortgage.  In order to obtain additional funds to cover the Debtors' losses, on September 26, 2008, the Debtors borrowed $450,000 from St. Nicholas Asset Resources LLC, which mortgage was assigned to Covenant Asset Resources, Ltd. (the "Subordinate Secured Lender") on May 26, 2010.  As a result there are three mortgages on the Real Property, the first two mortgages in the aggregate amount of $16,071,968.22 as a consolidated first mortgage ("First Mortgage") held by

the First Mortgagee which consists of a senior mortgage in the amount of $14,013,534.28 and a junior in the amount of $2,058,433.94, and a subordinate mortgage, held by the Subordinate Secured Lender in the principal amount of $450,000, plus interest.

4.     The Debtors' managing agent, Vorillas, Inc. located in Astoria, New York has been managing and supervising the daily operations of the Real Property for the two years prior to the Filing Date.  The Real Property has been confronted with increases in real estate taxes, water assessments and fuel costs.  The recession that occurred during 2007 and 2008 required the obtaining of the loan from the Subordinate Secured Lender because the commercial tenants fell behind in the payment of their rent, leaving no funds available for the renovation and re-rental of vacant units.  There are presently 6 units that remain vacant.

5.     Prior to the chapter 11 filing, the City of New York's Department of Housing Preservation and Development ("DHPD") commenced a number of actions in the Civil Court of the City of New York, County of New York: Part B, listed in Schedule 2 to Exhibit 1 to the Plan, pursuant to Sections 27-2121, 27-2123 and 27-2125 of the Administrative Code of the City of New York and Section 1802 of the New York City Charter to permit access and emergency repairs, as well as comprehensive actions for hundreds of housing code violations. On or about November 16, 2010, DHPD moved in the matter captioned *Department of Housing Preservation and Development of the City of New York vs. Dunkin 36 LLC, Konstandinos Vorillas and Behrooz Hedvat* *("Respondents")*, *Index No. HP 93/10* with respect to the apartment building at 3750 Broadway (the "Dunkin I Housing Violations") for an Order directing Respondents to pay civil penalties in the amount of $443,810 (the "Civil Penalties") pursuant to Title 27, Chapter 2 of the Administrative Code of the City of New York, the Housing Maintenance Code, and Section 304 of the Multiple Dwelling Law, for their failure to comply

with the mandates of the earlier Consent Order dated March 23, 2010 and directing them to correct all violations of the Multiple Dwelling Law and Housing Maintenance Code, including those that were not previously corrected. After the Filing Date, on January 25, 2011 the Honorable Timmie Elsner, Justice of the Housing Court entered a Default Order and Judgment against all Respondents except Dunkin, which had filed for Chapter 11 relief. DHPD filed a secured pre-petition proof of claim in the Dunkin I Case for the Civil Penalties.

6.    After the Chapter 11 filing, on or about February 15, 2011, the Debtors' Counsel was notified by DHPD's bankruptcy counsel of (i) a new tenant complaint at 3750 Broadway (Dunkin I) concerning a housing code violation under section 27-2005 of the Administrative Code and the need for access to the premises to verify and/or repair same, and (ii) 168 pre-petition Housing Code Violations (the "Dunkin Housing Violations") against the Debtors' apartment building at 4060 Broadway (Dunkin). Even though DHPD has not yet commenced litigation in Civil Court to enforce its rights with respect to the violations lodged pre-petition against 4060 Broadway, the City of New York, acting by and through its agency, DHPD, believes it has the right to proceed with the enforcement of these violations pursuant to the police power exception to the automatic stay set forth in 11 U.S.C. §362(b)(4) and may seek a comfort order in that respect from this Court, unless the Debtors and their tenants consent to access and the Debtors undertake to remedy these violations. To protect its rights, DHPD filed a secured pre-petition proof of claim in the amount of $386,030.00 for the Dunkin Housing Violations.

7.    Debtors have engaged in negotiations with DHPD concerning a possible resolution of the Dunkin and Dunkin I Housing Violations and DHPD proofs of claim referred to above. DHPD filed lis pendens with respect to the Dunkin and Dunkin I Housing Violations.

The Debtors, the Sponsor and DHPD have entered into the DHPD Stipulation resolving all of the Claims filed by DHPD which provides that the Claims filed by DHPD for the Dunkin and Dunkin I Housing Violations are Class 5 Claims will be paid in full under the Plan on or about the Effective Date of the Plan. The Debtors and/or the Sponsor have committed to make immediate funds available to correct any post-petition violations against Dunkin and Dunkin I in order to prevent new Civil Court actions being commenced by DHPD against the Debtors, their principals and the management company. The Debtors and the Sponsor have agreed in the DHPD Stipulation to exercise their best efforts to cure the Dunkin and Dunkin I Housing Court violations as promptly as possible and will continue their efforts to cure the Dunkin and Dunkin I Housing Court violations following the Effective Date, in an effort to deal with Tenants' failure to give access to the premises so that the violations can be remedied As part of the DHPD Stipulation, the Sponsor has agreed to pay DHPD $50,000 as of the Effective Date a a Class 5 Claim and, in addition, to deposit $100,000 with the Disbursing Agent which sum is to be drawn upon by the Sponsor for expenses incurred in remedying the violations.

## III.

## CHAPTER 11 FILING

8. The Debtors commenced the chapter 11 cases on December 30, 2010 (the "Filing Date") to fulfill and complete their obligations under the Plan Support and Acceptance Agreement, pursuant to which the Sponsor will fund the Cash Plan Amount of $500,000 plus such additional amounts that are required to fund all obligations under the Plan (the "Plan Deposit"). The Debtors determined that it would not make financial sense to expend the additional funds required to update and renovate the apartments and retail spaces in the Real Property and prior, to the Filing Date, entered into the Plan Support and Acceptance Agreement

with the Sponsor, which is incorporated in the Plan.

9.     In exchange for Sponsor's funding of the Plan, the Debtors will transfer title to the Real Property to the Sponsor on the Effective Date.  In order to obtain the Sponsor's cooperation, Behrooz Hedvat ("Hedvat"), a member of each of the Debtors, and a member of Bridgebar LLC (a non-debtor) has entered into the Bridgebar Letter Agreement which, among other things, grants to Bridgebar LLC an option to purchase the Bridgebar Mortgage on the Bridgebar Property at a $750,000 discount.  To the extent that additional funds are required to confirm the Plan, such funds will be obtained first from the Debtors' cash flow, next from the Cash Plan Amount and finally from the Sponsor, by reducing the discount, dollar for dollar, under which Bridgebar LLC may purchase the Bridgebar Mortgage. Notwithstanding anything herein to the contrary, in no event shall Sponsor be required to fund the Plan in any amount greater than the Cash Plan Amount and the Bridgebar Discount Fund Amount.  A copy of the Bridgebar Letter Agreement is attached hereto as Exhibit A.

10.     Under the Plan the Debtors are to deposit a sum not to exceed $95,000 with Debtors' Counsel to be held as the Counsel Fund which will provide for the fees and expenses of Debtors' Counsel for its work performed following the Filing Date both before and after the Confirmation Date.  Debtors' Counsel will (a) be reviewing Claims with the Debtors, (b) assert objections to Claims, if required, (c) hold the Plan Deposit and (d) make the Distributions under the Plan.  Debtors' Counsel fees to date exceed $80,000 and Debtors' Accountant's fees approximate $10,000.  It is presently estimated that post Filing Date fees and expenses of Professional Persons will aggregate $105,000.  The shortfall in the Counsel Fund will be paid by the Sponsor through use of the Bridgebar Discount Fund Amount.  Any unconsumed funds in the Counsel Fund will be added to the Plan Deposit. If the Plan Deposit is

sufficient to fund the Plan such unconsumed funds will be returned to the Sponsor.

11.     The Debtors filed the initial version of the plan together with the disclosure statement on the Filing Date in an effort to expedite confirmation of the Plan. Under the Plan all of the Debtors' obligations, except those due the First Mortgagee and the Subordinate Secured Lender, are to be paid in full by the Plan Deposit. The DHPD Stipulation resolves all of the issues between the Debtors, the Sponsor and DHPD and permits full inspection by DHPD to ascertain that the substantial majority of the violations have been corrected. One of the problems with the inspection is getting access to the tenants' apartments. It is believed by the parties that the DHPD Reserve of $100,000 will be sufficient to satisfy any remaining claims DHPD may have for the uncorrected violations.

12.     The Court fixed February 16, 2011 as the Bar Date for the filing of Claims in these Cases, except for governmental units. The Debtors' Schedules listed unsecured claims aggregating $77,473.73. The Bar Date has passed and the amount of scheduled as well as filed unsecured claims approximate $50,000. The New York City Department of Finance, the New York City Water Board, and New York City Environmental Control Board[1] have asserted claims in the Debtors' Cases approximating $450,000 plus the $150,000 to be set aside for the DHPD Claims and completion of work with respect thereto. To the $755,000 in claims set forth above must be added the $450,000 to be paid to the Second Secured Lender, for an approximate amount to be paid of $1,205,000. The Debtors have paid $65,000 against prepetition taxes, which has not yet been recorded on the City of New York's registers, which will reduce the amount payable for City real estate tax Claims, but statutory interest will continue to accrue on all unpaid amounts until fully paid on the Sale Closing Date. The Sponsor's $500,000 together

---

[1]     The funds for the ECB Claim in the amount of $85,446.89 shall be deposited with the Sponsor's title insurance company and shall be

with the BridgeBar Discount Amount of $750,000 will provide sufficient funds to pay all claims in full.

13.     Provided that the Debtors prevail at confirmation and a final confirmation order is entered granting an exemption from stamp and similar taxes, on the Effective Date the Assets will be transferred to the Sponsor, free and clear of all liens, claims, interests and encumbrances.  The transfer shall be exempt from transfer or mortgage taxes pursuant to Section 1146 of the Bankruptcy Code, but shall be subject to the Class 1, 5, and 6 Claims, the Permitted Exceptions indicated in schedule 2 attached to the Plan, and the First Mortgage pursuant to §§105(a) and 363(b), (f), (m), 365, 503(b) and 507 of the Bankruptcy Code.  Based upon the December 2010 appraisals of the Real Property that indicate the gross value at $10.1 million and in view of the fact that the Claim of the First Mortgagee aggregates in excess of  $16.6 million, the Plan will provide for payment to unsecured creditors that would otherwise have no recovery for their claims.   Only the NYC Priming Liens would be satisfied in full in a Chapter 7 liquidation.

## IV.

## SUMMARY OF THE PLAN SUPPORT AND ACCEPTANCE AGREEMENT

14.     Provided that the Plan has been confirmed and a final confirmation order has been entered granting the Debtors an exemption from stamp and similar taxes under 11 U.S.C. § 1146(a), on the Sale Closing Date the Debtors will transfer all of its, right, title and interest to the Assets including its assumption and assignment of the Assumed Executory Contracts free and clear of transfer taxes pursuant to §1146 of the Code, in accordance with the Confirmation Order.  The Confirmation Order shall incorporate the Plan Support and Acceptance

---

distributed in accordance with the provisions of section 4.6 of the Plan.

Agreement pursuant to which the Sponsor will advance sufficient funds to the Plan Deposit to pay all creditors in full for their claims and the DHPD Stipulation. The Plan Deposit is now estimated at $1,200,000. The Sponsor is making available $500,000 as the Cash Plan Amount and the balance will be paid by the Debtors from excess cash flow or by the Sponsor from the Bridgebar Discount Fund Amount. The Sale Closing Date, which is also the Effective Date of the Plan, will take place promptly following the date the Confirmation Order becomes a Final Order. The Consummation Date under the Plan is the earliest date to occur following the Effective Date, when (a) the Distribution Account contains sufficient Cash to pay in full the remaining Classes of Creditors not paid on the Sale Closing Date or (b) all objections to Claims are concluded.

15. The Plan Support and Acceptance Agreement was negotiated by the Debtors, the Sponsor, and the First Mortgagee and the Subordinate Secured Lender, who are the only impaired Creditors under the Plan. The Plan incorporates the provisions of the Plan Support and Acceptance Agreement and the First Mortgagee and the Subordinate Secured Lender have executed the Ballot to accept their treatment under the Plan. All other Classes of Creditors and Interests are unimpaired under the Plan and under Section 1126(f) of the Code are conclusively presumed to have accepted the Plan.

16. The assumption and assignment of the Tenant Leases to the Sponsor are to be made free and clear of the tenants' rights, if any, to obtain any recovery from the Sponsor, by way of offset from any payments due to the Tenants by the Debtors, or by another method or form of recovery (hereinafter "Pre-Closing Date Offsets"), except for such sums that were incurred by the Sponsor from and after the Sale Closing Date. Lease payment reductions that have been ordered by the Housing Court shall remain in effect and the assumption and

assignment of all Tenant leases shall be as dealt with by any final Housing Court decisions.  If any housing violations are uncorrected, the tenants have the right to restore litigations against the Debtors or commence new actions in Civil Court which can result in additional civil penalties payable to DHPD.  Any such additional claims or penalties would be administrative expense claims under 11 U.S.C. § 503(b).

       17.     Debtors have filed a motion dated February 2, 2011, on notice to all the Tenants, both residential and commercial, the purpose of which is to determine what claims if any the Tenants may have against the Debtors.  The Debtors' schedules indicate that except for security deposits that were to have been held by the Debtors (the "Funded Security Deposits"), there are no cure claims.  Pursuant to the Plan, the Sponsor has agreed to assume and pay the cure amounts, if any, for the Assumed Executory Contracts as determined by Final Order of the Court.  On or before the Effective Date, the Debtors shall turn over to Sponsor the Funded Security Deposits relating to the Assumed Executory Contracts.  To the extent that the amount of the Funded Security Deposits is less than the amount of the security deposits required to be maintained by the Debtors in connection with the Tenant Leases, the Debtors shall pay the Sponsor such difference on the Effective Date. The Confirmation Order shall direct the Tenants to make payments to the Sponsor for obligations incurred from and after the Sale Closing Date, without deducting Pre-Sale Closing Date offsets, if any.  The Pre-Sale Closing Date offsets shall be the sole responsibility of the Debtors and to the extent the Debtors' cash flow is insufficient, shall be paid from the Plan Deposit.

       18.     The Debtors do not have the funds to pay all of their pre-petition debts. After the Filing Date, the Debtors are responsible making payment of all Administrative Claims out of the Debtors' cash flow from the Real Property.  Administrative Claims include (i) all fees

and interest payable under 28 U.S.C. §1930(a)(6) and (f) and 31 U.S.C.§3717 on a quarterly basis, both before and after the Confirmation Date of the Plan; (ii) the NYC Priming Administrative Claims for unpaid post-petition real estate taxes and water and sewer charges; and (iii) the DHPD claims for administrative Housing Code violations.    Without the Plan Support and Acceptance Agreement, no funds would be available for creditors under a Plan other than funds to pay the NYC Priming Liens, but  insufficient to satisfy the First Mortgage, if the Real Property were to be sold.  The December 2010 appraisal of the Real Property indicates that its value does not exceed $10,100,00 – 3600 is valued at $2,100,000, 3750 is valued at $3,800,000 and 4060 is valued at $4,200,00, which aggregate is significantly less that the $16,071,968.22 amount due the First Mortgagee under the First Mortgage.

19.    Deleted.

## V.

## OTHER ISSUES

20.    No Committee has been appointed by the Office of the United States Trustee because all Classes of Creditors (except Classes 2 and 3) are being paid in full. The Debtors have negotiated the Plan with the City of New York, Debtors' First Mortgagee and Subordinate Secured Lender, as well as the Plan Support and Acceptance Agreement with the Debtors' First Mortgagee and Subordinate Secured Lender, both of whom have accepted the Plan and its treatment of their Claims.  The Debtors, the First Mortgagee, the Sponsor and the Subordinate Secured Lender believe that failure to confirm the Plan will likely result in the failure of all Creditors, including the First Mortgagee (other than the NYC Priming Liens which are senior to and prime the First Mortgage), to receive payment in full with respect to their

Claims. The Plan proposes to pay Class 1, 4, 5, 6 and 7 Creditors in full, which is more than they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

## VI.

## INTRODUCTION TO THE PLAN

21.    The Plan provide for the division of Claims and Interests into Classes:

Class 1 is comprised of the NYC Priming Pre-Petition Liens

Class 2 is comprised of the First Mortgagee Claim

Class 3 is comprised of the Subordinate Secured Claim

Class 4 is comprised of the Priority Claims

Class 5 is comprised of the DHPD Claims;

Class 6 is comprised of the ECB Claims

Class 7 is comprised of the General Unsecured Claims

Class 8 is comprised of the Holders of Membership Interests

## VII.

## ANALYSIS OF THE PLAN

22.    A Class is not impaired within the meaning of the Code if under the Plan the holders of Allowed Claims in such Class receive the Allowed Amount of their Claims in Cash or other property of the Debtors equal to the Allowed Amount of such Claim or Interest as of the Consummation Date of the Plan. Claims in Class 2 and Class 3 are impaired under the Plan. Claims in Class 1, 4, 5, 6 and 7 are not impaired since they are being paid in full the amount that is due them. The Interests in Class 8 are not impaired since they retain their interest in the Debtors but receive no distribution under the Plan, pursuant to which all of the Debtors' known Assets are to be sold to the Sponsor.

23.     Debtors' Counsel is to submit post confirmation reports within fifteen (15) days following the end of each calendar quarter, until the earlier to occur of entry of a (i) final decree closing the Cases, (ii) Final Order dismissing these Cases, or (iii) Final Order converting the Cases to Chapter 7 Cases.  All U.S. Trustee Fees incurred by the Debtors up to the Effective Date, shall be paid by the Debtors on or before the Effective Date and shall be paid by the Disbursing Agent out of the Distribution Account from and after the Effective Date until the earlier to occur of entry of a (i) final decree closing the Cases, (ii) Final Order dismissing these Cases, or (iii) Final Order converting the Cases to Chapter 7 Cases.

24.     Administrative Claims consist of claims incurred during the pendency of the Debtors' Cases in the ordinary course of business, as well as Professional Fee Claims fixed by Final Orders on notice to the Debtors, the Sponsor and the US Trustee. The Allowed Amount of Administrative Claims shall be satisfied, settled and discharged in full, provided the Confirmation Order has become a Final Order, by the payment in Cash (a) on the Effective Date or as soon as practicable thereafter, (b) when due in accordance with their terms, or (c) upon such terms as may be agreed upon between the Debtor and the respective Claimant entitled to such payment. Administrative Claims unpaid as of the Confirmation Date (including Professional Fees) and payments of post confirmation Professional Fees, shall be paid by the Debtors through their available cash flow until the Sale Closing Date and if there is insufficient cash flow, from the Plan Deposit.  If an objection has been asserted to the amount of any Post Confirmation Date Professional Fee and the objection remains unresolved, then such Professional Person must file an application for allowance with the Court, which shall determine the amount of the Professional Fee payable to such Professional Person.  The First Mortgagee has agreed to permit the Debtors to use its cash collateral

during the course of the Chapter 11 Cases to enable the Debtors to pay Administrative Claims as they come due, in order that the Plan can be confirmed.

25.     The Debtors believe that the only outstanding Administrative Claims that remain to be paid are: (a) the NYC Priming Administrative Claims with statutory interest thereon from January 25, 2010 to the Sale Closing Date; (b) the DHPD Claims for Housing Violations occurring post-petition; (c) amounts due for statutory interest on the NYC Priming Pre-Petition Claims from and after January 25, 2011 through the Sale Closing Date, (d) any unpaid post-petition water and sewer rents due to the Water Board; (e) sums that may become due to Professionals Persons retained in these Cases and the US Trustee Fees that have not yet become due.  The City has filed Administrative Claims for real estate taxes due post petition inclusive of interest through January 24, 2011 and that sum has been included in the amounts required to confirm these Cases. The amounts due Professional Persons are estimated at $105,000.  The interest due to the City through the Sale Closing Date has not been calculated, but the Debtors submit that it shall not exceed the amounts available under the Bridgebar Discount Fund Amount.  The amounts due or that may become due DHPD for post-petition Housing Court violations in the event such violations are not cured by the Debtors and/or the Sponsor prior to the Effective Date, have not been yet calculated.

26.     The Court fixed February 16, 2011 as the Bar Date for filing all prepetition claims against the Debtors, except for claims of governmental units.  The Debtors' Counsel, Marilyn Simon & Associates, received a $50,000 pre-petition retainer, approximately $45,000 of which was consumed prior to the Filing Date.  The Debtors' other Professional Persons received no retainer. The Professional Persons estimate that unpaid post-petition fees through the Effective Date may approximate $105,000.00.  To the extent the Debtors' cash flow is insufficient to fund the

18

Professional Fees and US Trustee Fees, the Sponsor has agreed to increase the Plan Deposit by such amounts, and shall modify the Bridgebar Discount Fund Amount in accordance with the provisions of the Bridgebar Letter Agreement.

27. The Plan provides that the Allowed Class 2 Claim is impaired. The Sponsor shall take title to the Real Property subject to the First Mortgage. The First Mortgagee retains its First Mortgage, but shall receive no Cash payment under the Plan. The Allowed Class 3 Claim is to be paid the $450,000 the principal sum originally advanced, but will receive no interest under the Plan. The only impaired Claims are the Secured Claims in Classes 2 and 3 of the Plan, because they are not receiving full payment under the Plan.

28. The Plan provides that Class 1 NYC Priming Pre-Petition Liens, Class 4 Priority Claims, Class 5 DHPD Claims, Class 6 the ECB Claim, and Class 7 General unsecured Claims are not impaired and will be paid in full, in cash, on the Effective Date. If the case is converted to chapter 7 there will be no proceeds available for creditors (except for the NYC Priming Pre-Petition Liens and Administrative Claims which are superior to the First Mortgage) unless the Assets can be sold for in excess of $16,571,335.16, the amount due the Class 1 and Class 2 Claims. The Real Property has been appraised at $10,100,000, which, though sufficient to pay the NYC Priming Liens, is insufficient to pay off the sums due the First Mortgagee.

29. It is estimated that the Consummation Date will occur within sixty (60) days following the Effective Date, unless further extended by Court Order.

30. A Class is not impaired within the meaning of the Bankruptcy Code if, under the plan, the holders of Allowed Claims in such Class receive the Allowed Amount of their Claims in Cash or, in the case of Secured Claims, the Claimant's collateral equal to the Allowed Amount of such Claim or Interest as of the Consummation Date of the Plan. Under the Plan, the Sponsor will

receive title to the Real Property which has been valued at less than the amount of the First Mortgage.  The Sponsor will be required to fund the Plan Deposit which is presently estimated to approximate $1,205,000, to satisfy the remaining Classes of Creditors, including sums due to Professional Persons, plus sums that may be due for US Trustee Fees.  Holders of Interests will retain their interests in the Debtors, are not impaired under the Plan, but will not receive any distribution under the Plan.

31.  Payment with respect to Class 1 Claims shall be made on the Sale Closing Date.  Payment with respect to all other Classes of Claims to which no objection has been filed shall be made on the Consummation Date.

32.  The Plan provides that the Debtors may (a) commence litigation before the ECB within the time provided in paragraph 4.6 of the Plan and (b) Class 4 and 7 Claims within ninety (90) days following the Confirmation Date or such later date approved by Final Order of the Court.  With respect to Class 1 Claims of the NYC Priming Liens, such claims shall be deemed allowed as of the confirmation hearing.   Claims filed after the Bar Date that have not been scheduled by the Debtors as undisputed or unliquidated, except for Administrative Claims, will not be permitted to share in the Distribution to Claimants under the Plan.

33.  The absolute priority rule of the Bankruptcy Code requires that a plan may not provide for payment to a junior class unless it provides for payment in full to the superior classes of creditors, unless the superior class consents to such treatment.  The Plan satisfies the absolute priority rule if the NYC Priming Pre-Petition Liens are satisfied on the Sale Closing Date as provided herein and in the Plan and because the Sponsor and Subordinate Secured Lender have each agreed to be paid less than the amount due them and they are the only impaired Creditors under the Plan.  Although equity interest holders are retaining their interest, the absolute priority rule is not

violated as long as the Impaired Creditors have voted in favor of the Plan, and such votes have been obtained under the Plan Support and Acceptance Agreement.

34.     It is believed that the Plan can be confirmed on or about April 4, 2011 and the Effective Date will occur on the Sale Closing Date.

## VIII
## LIMITATIONS OF LIABILITY AND RELEASES

35.     To the extent permissible under Section 1125(e) of the Bankruptcy Code, except as expressly set forth in the Plan or in the Confirmation Order, effective on the Final Distribution Date, none of Released Parties shall have or incur any liability for any actions taken or omitted to be taken before or after the Filing Date, under or in connection with, related to, affecting or arising out of their dealings with the Debtors, any of the Debtors' operations, the filing of the chapter 11 petitions, the Cases, the administration of the Debtors' Cash, Assets, Real Property and personal property, the negotiation, implementation, pursuit of confirmation of the Plan, the consummation and administration of the Plan, the sale of the Debtors' Assets, including the Real Property, except for such acts identified in the Exclusions to Releases and the Police Power Claims.  In all respects, the Released Parties shall be entitled to rely upon the advice of counsel with respect to his, her or its duties and responsibilities under the Plan.  The Plan constitutes a release among the Creditors and the Released Parties by all past and present holders of Claims or Interests, directly or indirectly, to effect the foregoing as of the Confirmation Date, but subject to the occurrence of the Final Distribution Date.  No provision of the Plan is intended to limit the liability of Professional Persons to their clients for malpractice pursuant to 1.8(h) of the New York Rules of Professional Conduct.  Notwithstanding anything to the contrary contained in the Plan, none of the injunctions and releases provided for in the Plan shall limit, adversely affect or otherwise impair the right of (a) governmental authorities to assert Police

Power Claims or (b) any third party to assert and pursue claims against indemnitors (other than the Debtors or the Sponsor) under indemnity agreements.  Nothing in the Confirmation Order or Plan shall limit, impair, or in any way affect the application of any laws or regulations of the United States, and nothing in the Plan shall release any of the Released Parties for any Exclusions to Releases and Police Power Claims.

36.  In a recent decision by the Third Circuit Court of appeals (In re: Metromedia Fiber network, Inc., et al.  416 F.3d 136) that court determined that in bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan." *SEC v. Drexel Burnham Lambert Group, Inc.* ( *In re Drexel Burnham Lambert Group, Inc.*), 960 F.2d 285, 293 (2d Cir.1992). While none of the cases explain when a nondebtor release is "important" to a debtor's plan, it is clear that such a release is proper only in rare cases. *See, e.g., Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 657-58 (6th Cir.2002) ( "[S]uch an injunction is a dramatic measure to be used cautiously ...."). Courts have approved nondebtor releases when the estate received substantial consideration, *e.g., Drexel Burnham,* 960 F.2d at 293; the enjoined claims were "channeled" to a settlement fund rather than extinguished, *MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 837 F.2d 89, 93-94 (2d Cir.1988); *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 701 (4th Cir.1989); the enjoined claims would indirectly impact the debtor's reorganization "by way of indemnity or contribution,". Nondebtor releases may also be tolerated if the affected creditors consent. *See In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir.1993).  Substantial financial contributions from non-debtor non-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible.  In this case, but for Sponsor's agreement to

fund the Plan, the Debtors could not successfully confirm the Cases. In addition to funding the Plan Sponsor has funded the cost to file the chapter 11 cases and has pre-funded a significant portion of the Fees payable to Debtors' Counsel. In such a case, the releases granted under the Plan are appropriate.

**IX.**

**<u>ALTERNATIVES TO THE PLAN</u>**

37.     If the Plan is not confirmed, the only alternatives would be for the First Mortgagee and/or the Subordinate Secured Lender and/or DOF to move to lift the automatic stay of §362 of the Code in order to foreclose, or move to convert the Debtors' Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or to dismiss the Chapter 11 Cases.   In a foreclosure proceeding, or a Chapter 7 Liquidation, if a sale of the Real Property is conducted by the Trustee in Bankruptcy, or if the cases were to be dismissed, only the NYC Priming Liens would be paid in full with statutory interest thereon, with the First Mortgagee to receive the balance of the proceeds of sale after the receiver in the foreclosure action, Trustee in Bankruptcy and his or her professionals receive payment of their claims. If the case is dismissed, the City could sell the unpaid real estate taxes and water and sewer charges to a tax lien trust which can then foreclose on the Debtors' Real Property. The Debtors submit that the Plan affords holders of Claims and Interests the potential for the greatest and fastest realization on their Claims and, therefore, is in the best interests of such holders.

38.     If the Chapter 11 case were converted to liquidation under Chapter 7 of the Code, there would be no funds to pay Creditors because the NYC Priming Liens hold a first lien and the First Mortgagee and the Subordinate Secured Lender hold second and third liens, respectively, on all of the Debtors' Assets and are owed more than appraised value of the Real

Property. Annexed hereto as Exhibit "B" is a liquidation analysis that sets forth the various classes of Claims and Interests under the Plan and the amounts asserted by each class of Claims and Interests. In any of the foregoing events, there would be no funds available to pay a trustee in bankruptcy or the trustee's professionals, and clearly nothing available to holders of Unsecured Claims. The only funds the Debtors have in their accounts are required to meet payroll and other pressing operating needs of the Debtors. Thus, the Debtors submit that the Plan represents the best available alternative for maximizing the return to holders of Claims and Interests.

## X.

## ANALYSIS OF BANKRUPTCY ACTIONS

39. The Plan provides that the Debtors shall waive all Bankruptcy Actions against holders of Claims, including actions and causes of action pursuant to §§544, 547, 548, 549 and 550 thereof, including all claims against creditors for alleged fraudulent transfers under state law utilizing Section 544 of the Bankruptcy Code. Such claims, if they exist and were asserted and collected, would give the creditor sued a prepetition unsecured claim in the amount collected, which claim would be paid 100% under the Plan. Thus, there would be no additional benefit to the Estates by the assertion of such claims, but there would be additional costs to the Estates for the Professional Fees incurred pursuing such claims.

## XI.

## MISCELLANEOUS

40. By order dated January 14, 2011 the Court fixed February 16, 2011 as the last day by which all Creditors (except holders of Professional Fee Claims[2], the U.S. Trustee and

---

[2] Applications for allowance of compensation by Professionals retained in this Case will be heard by the Court shortly following

governmental units) may assert pre-petition Claims against the Debtors. Any holder of a Claim against the Debtors that failed to file a proof of Claim on or before the Bar Date (and which was listed on the Schedules as contingent, disputed or unliquidated) will not, with respect to such Claim, be treated as a creditor for purposes of distribution under the Plan, and is forever barred, estopped and enjoined from asserting such Claim against the Debtors or the chapter 11 estates.

41. Unclaimed Distributions (including Distributions made by checks that have not been negotiated by the payee) shall be retained by the Disbursing Agent and held in trust for the beneficial holders of Allowed Claims entitled thereto for a period of ninety (90) days after the Distribution Date. Any Distribution remaining unclaimed during that period shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distributions(s) shall be deemed forfeited and expunged, the holder of such Claim shall be removed from the Distribution schedules and the Distribution shall be deposited in the Counsel Fund for Distribution as provided under the Plan, following ten (10) Business Days written notice to the beneficial holders of such Claims. All Distributions shall be made to the holders of Claims at the address listed on their respective proofs of claim filed with the Court or, if no proof of claim has been filed, at the address listed in the Schedules.

## XII.

## TAX IMPLICATIONS OF PLAN

42. The following discussion is a summary of certain anticipated federal income tax consequences of the transactions proposed in the Plan to the Debtors and to the holders of Claims against or Interests in the Debtors. The summary is provided for informational purposes, only and is based on the Internal Revenue Code (the "Tax Code"), treasury regulations, judicial decisions and

confirmation of the Plan.

administrative determinations, all as in effect on the date of this Disclosure Statement and all subject to change, possibly with retroactive effect.

43.     The summary does not address all aspects of federal income taxation that may apply to a particular holder of a Claim or Interest in light of such holder's particular facts and circumstances or to certain types of holders of Claims or Interests subject to special treatment under the Tax Code (such as financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, non U.S. taxpayers and holders who received Claims or Interests in connection with the performance of services) and also does not discuss any aspects of state, local, or foreign taxation.

44.     No ruling will be sought from the Internal Revenue Service ("IRS") with respect to any of the tax aspects of the Plan and the Debtors have not obtained any opinion of counsel with respect to such consequences.  Accordingly, each holder of a Claim or Interest is strongly urged to consult with its accountants or other tax professional as to the tax consequences of the Plan.

A.      **U.S. Federal Income Tax Consequences to the Liquidation of the Debtors**

45.     The Debtors believe that no additional taxes will be incurred for the Debtors Estates as a result of the Debtors' transfer of its Real Estate, as set forth in the Plan.  In these Cases, since all Creditors but the Secured Creditors are being paid in full, there should be no cancellation of indebtedness income ("COD Income").  Moreover, Section 1141(d)(3) of the Bankruptcy Code provides that there is no discharge of indebtedness granted a business debtor if the Plan provides for liquidation of all the debtor's assets and the debtor does not engage in business after confirmation of the plan.

B.      **Federal Income Tax Consequences to Claim Holders.**

46.     The Federal income tax treatment of holders of Claims generally depends on whether such Claims are treated as "securities" for Federal income tax purposes. It is likely that Claims do not constitute "securities" for Federal income tax purposes, and the remainder of this summary assumes that such Claims do not constitute securities.

47.     Since each holder of an Unsecured Claim will receive Cash of 100% of the amount of its allowed claim, there should be no loss attributable to the holder's tax basis. Holders of Claims for unpaid employee compensation (assuming such holders are cash-method taxpayers) will be required to treat all amounts received in respect of such Claims as ordinary compensation income at the time such amount is paid (including any amount withheld in respect of employment taxes). There are no holders of subordinated claims in this case and Interest holders are required to recognize loss equal to the reduction in the tax basis of their Interests.

## XIII.
## POSTCONFIRMATION

48.     No objections will be asserted against Class 1 and Class 5 Claims. Objections to Class 4 and 7 Claims will be asserted within (90) days following the Effective Date.

## XIV.
## EFFECT OF CONFIRMATION

49.     The Distributions and other treatment afforded to all holders of Claims and Interests under the Plan shall be in full and complete satisfaction of all Claims against and Interests in the Debtors.     Upon receipt by the Disbursing Agent of the Plan Deposit and receipt by the Title Insurance Company of the amount necessary to pay the ECB Claim in full, except for the Exclusions to Releases and Police Power Claims:

   **a.  the Released Parties shall be deemed to have exchanged mutual general releases of all Claims by and among themselves, and**

> b. **all creditors, interest holders and other parties in interest in this Case shall be deemed to have granted a complete release and waiver of the Released Parties with respect to all claims, causes of action, rights and liabilities addressed and released by the Plan;**

provided, however, that the Equity Holders shall not be deemed released until the Final Distribution Date. Nothing in the Plan is intended to limit the liability of Professional Persons to their clients for malpractice pursuant to 1.8(h) of the New York Rules of Professional Conduct.

50. Except as otherwise expressly provided in the Plan, as of the Effective Date, the Released Parties shall be released from, and the Confirmation Order shall operate as an injunction against, among other things, the commencement or continuation of any action or the employment of process to collect, offset or recover against any of said entities or their estates, any Claim that arose or was incurred before the Confirmation Date, or from any conduct, act or omission, in connection with or related to the Plan, the DHPD Stipulation, this Disclosure Statement, or in connection with the Debtors' Cases prior to the Confirmation Date. For a more complete description of the injunctions and releases in the Plan, see Article VIII of the Plan.

## XV.

## ANTICIPATED CONFIRMATION DATE

51. It is anticipated that the Confirmation of the Plan will occur in or about April 4, 2011 and the Consummation Date will occur on or before May 31, 2011. The Consummation Date is the date on which payments to Allowed Claims under the Plan shall commence.

## XVI.

## CONCLUSION

The Debtors believe that confirmation of the Plan is in the best interests of the Debtors, their Creditors and the Estates in that the Plan provides for a Distribution to Creditors that they would not otherwise receive in a liquidation under chapter 7 of the Bankruptcy Code.

Dated: New York, New York                      DUNKIN 36 LLC
       April 1, 2011                              DUNKIN 36 I LLC
                                            DUNKIN 36 II LLC

By: /s/Behrooz Hedvat

CONSENTED AND AGREED TO      Behrooz Hedvat, a member
ON BEHALF OF SPONSOR         of each of the Debtors
DUNKIN LENDER LLC

By /s/J. Joseph Jacobson
Name:  J. Joseph Jacobson
Title:  Authorized Person